Argued and submitted April 23, affirmed in part,
reversed in part, and remanded June 9, 1980

## CLARK,
*Appellant,*

*v.*

## FORD MOTOR COMPANY, et al,
*Respondents.*

### (No. 78-1228, CA 15327)

612 P2d 316

Martin E. Stone, Coquille, argued the cause for appellant. With him on the briefs was Slack, Slack and Stone, Coquille.

Stuart M. Brown, Eugene, argued the cause for respondents. With him on the brief was Young, Horn, Cass & Scott, Eugene.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

BUTTLER, J.

**BUTTLER, J.**

Plaintiff appeals from the "decree" entered in favor of both defendants in this action brought to recover the purchase price of an automobile manufactured by defendant Ford Motor Co. (Ford) and sold to plaintiff by defendant Beaty Ford-Mercury, Inc. (the dealer). We affirm as to the dealer but reverse and remand as to Ford.

Plaintiff purchased a new 1977 Ford Bronco from the dealer in August, 1977, after selecting that vehicle in the showroom. He made a cash down payment of $381 and agreed in an installment sales contract with the dealer to pay the balance, with interest, in 48 monthly payments of $170.38.

As part of the sales transaction plaintiff received an express warranty which provided that Ford would repair or replace free any parts found to be defective within the first 12 months or 12,000 miles. The warranty of merchantability was limited to the same 12 month/12,000 mile duration.[1] Plaintiff also signed a

---

[1] The warranty specifically provided:

"Ford warrants for its 1977 model cars and light trucks that the Selling Dealer will repair or replace free any parts, except tires, found under normal use in the U.S. or Canada to be defective in factory materials or workmanship within the earlier of 12 months or 12,000 miles from either first use or retail delivery.

"All we require is that you properly operate and maintain your vehicle and that you return for warranty service to your Selling Dealer or any Ford or Lincoln-Mercury Dealer if you are traveling, have moved a long distance or need emergency repairs. Warranty repairs will be made with Ford Authorized Service or Remanufactured Parts.

"THERE IS NO OTHER EXPRESS WARRANTY ON THIS VEHICLE.

"ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS IS LIMITED TO THE 12-MONTH/12,000-MILE DURATION OF THIS WRITTEN WARRANTY.

"TO THE EXTENT ALLOWED BY LAW, NEITHER FORD NOR THE SELLING DEALER SHALL HAVE ANY RESPONSIBILITY FOR LOSS OF USE OF THE VEHICLE, LOSS OF TIME, INCONVENIENCE, COMMERCIAL LOSS OR CONSEQUENTIAL DAMAGES.

document entitled "Disclaimer Form" which identified the Bronco being sold and stated:

"Any warranties on the vehicle sold hereby are those made by the manufacturer. The seller, Beaty Ford Merc, hereby expressly disclaims all warranties, either express or implied, including all implied warranties of merchantability or fitness for the particular purpose, and Beaty Ford Merc neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle described hereon."

The day he took possession of the vehicle plaintiff noted that the radio antenna appeared to be missing and, in searching for it, found sandy, foreign matter underneath the paint on part of the vehicle. He also observed that water was leaking onto the carpet in the front of the Bronco. Upon returning the Bronco to the dealer the paint was repaired and an antenna provided. The door was adjusted to prevent water leakage but that adjustment caused it to fit improperly and to bulge out from the body somewhat.

Shortly thereafter more foreign matter was discovered in the paint and the Bronco was returned for a complete repainting. About a week after the vehicle was repainted plaintiff noticed rust stains bleeding through the paint. The Ford factory representative was contacted and attempts were made to discover a remedy for the rust problem. It was discovered that the rust was in many of the seams of the Bronco, including those around the top molding, hood, tailgate, windshield and interior. Plaintiff and the factory representative were told by two different paint shops that repainting would not stop the rust because it was in the seams; neither shop would guarantee a new paint

---

"Some states do not allow limitations on how long an implied warranty lasts or the exclusion or limitation of incidental or consequential damages, so the above limitations may not apply to you.

"This warranty gives you specific legal rights, and you also may have other rights which vary from state to state."

job. It was suggested that the only way to stop the rust would be to disassemble the body, dip the parts in a chemical solution, and then repaint it — a process estimated to cost over $2,000.

Although he had been told that sandblasting and repainting would not cure the rust problem, plaintiff agreed to the suggestion of the factory representative that the sandblasting procedure be tried. The Bronco was taken on June 6, 1978, to the shop which was to do the work, but before the work was commenced, Ford decided that it would authorize only spot touch-ups of the rust stains, but not the sandblasting.

Plaintiff made his monthly contract payments through July, 1978. Shortly before the warranty from Ford was to expire he contacted an attorney and, in early August, demanded from the dealer the return of the money he had paid. The money was not returned.

The Bronco remained at the repair shop, where it had been taken in June, until September, 1978, when the dealer asked plaintiff to bring it in again for an estimate of the damage. Plaintiff returned the Bronco to the dealer, where it remained. This action was filed in October, 1978. The dealer later formally repossessed the Bronco, and resold it in May, 1979.

In this action plaintiff seeks rescission of the installment sales contract and the return of his down payment and monthly payments, totalling $2,255.18. He invokes the Uniform Commercial Code remedy of revocation of acceptance, codified in ORS 72.6080, and also seeks return of his money under the Oregon Consumer Warranty statutes, ORS 72.8010 - 72.8200.[2]

At the outset, we are confronted with the question of our scope of review. Plaintiff contends that the action is one for rescission and that the action was

_____

[2] Plaintiff also relies upon the Magnuson-Moss Warranty Act, 15 USC section 2304 *et seq.,* but we find that statute to be inapplicable to these facts.

apparently treated as an equitable proceeding below; therefore, our review is *de novo.* Defendants argue that our review is one for substantial evidence only, because the action is at law. We need not decide that question with respect to the revocation of acceptance claim under ORS 72.6080[3] because we conclude that plaintiff did not bring himself within its provisions as a matter of law. Plaintiff's claim under ORS 72.8010 - 72.8200 is strictly a statutory remedy, and in the absence of a specific statutory provision so providing, we do not treat our review as *de novo.* [4]

The trial court concluded as a matter of law that plaintiff may not recover from either defendant on a revocation of acceptance theory. We agree. Plaintiff did not buy the Bronco directly from Ford and there is no evidence that the dealer was acting as Ford's agent in making the sale. A buyer may revoke acceptance only as to his seller. *Voytovich v. Bangor Punta Operations, Inc.,* 494 F2d 1208 (6th Cir 1974); *Volvo of*

---

[3] The scope of review in revocation of acceptance cases has been raised in the Supreme Court, but the Court has found it unnecessary to decide it. *See Industrial Contract Car. v. Pacific Diesel,* 277 Or 677, 562 P2d 164 (1977); *Wadsworth Plumbing v. Tollycraft Corp.,* 277 Or 433, 560 P2d 1080 (1977). *Cf. Lanners v. Whitney,* 247 Or 223, 428 P2d 398 (1967), where there was a basis for rescission on traditional equitable grounds as well as revocation of acceptance under the UCC.

[4] ORCP 2 abolishes all procedural distinctions at the trial level between law and equity. The Council on Court Procedures does not make rules of appellate procedures and the rules do not purport to affect them. The distinction, therefore, based upon the legal or equitable nature of a case presumably will remain in appellate procedure, and that procedure will depend, at least to some extent, on whether there is a right to a jury trial.

ORCP 50 preserves the right to jury trial as declared by the Oregon Constitution, Article VII (Amended), section 3, or by statute. The statutory remedy here involved does not expressly provide for a jury trial, neither does it characterize the remedy as equitable nor provide for *de novo* appellate review. At first blush, the remedy appears to be akin to rescission, historically equitable; there is, however, no contract between plaintiff and Ford to rescind. Although the Constitutional guaranty of trial by jury does not expand the classes of cases in which jury trial is available, but merely preserves it as it was when the constitution was adopted, *Moore Mill & Lbr. Co. v. Foster,* 216 Or 204, 336 P2d 39, 337 P2d 810 (1959), the specific statutory remedy (money) sought by plaintiff here appears to fall within the class formerly characterized as in law.

If we are correct in that analysis, our review would not be *de novo.*

*America Corp. v. Wells,* 551 SW2d 826 (Ky App 1977); *Conte v. Dwan Lincoln-Mercury, Inc.,* 172 Conn 112, 374 A2d 144 (1976); *but see Durfee v. Rod Baxter Imports, Inc.,* ____ Minn ____, 262 NW2d 349 (1977) (seller had gone out of business and warrantor who was not seller held liable for revocation of acceptance.) "Seller" is defined as "a person who sells or contracts to sell goods." ORS 72.1030(1)(e). Ford did not sell or contract to sell to plaintiff; therefore, plaintiff may not revoke acceptance as to Ford.

As to the dealer, we focus on what is required under its contract with plaintiff. The first requirement under ORS 72.6080 is a "nonconformity" in the goods received. Under ORS 72.1060(2)

> "Goods * * * are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract."

Plaintiff testified that he selected the Bronco which he bought in the dealer's showroom. The contract was for the sale of that particular Bronco. The dealer disclaimed all warranties on the Bronco.[5] The contract required that the dealer deliver that particular Bronco to plaintiff[6] and that was done. It cannot be said, therefore, that the vehicle did not conform to the requirements of the contract between plaintiff and the dealer. In this situation plaintiff may not revoke his acceptance as to the dealer.

The Consumer Warranty Act, ORS 72.8010 *et seq.,* [7] however, provides additional protection for purchasers of consumer goods[8] beyond that provided by

---

[5] Plaintiff did not question the effectiveness of the disclaimer by the dealer and we make no judgment as to its effectiviness.

[6] The question might be different if the buyer is shown a model or sample and orders a car on that basis; the obligations of the dealer may be more extensive even where an attempt is made to disclaim all warranties.

[7] ORS 72.8010 to 72.8200 were enacted separate from the UCC and was not made a part of the UCC by legislative action. The physical placement of them in the UCC - Sales was an editorial judgment.

[8] Consumer good is defined to include a new motor vehicle "used or bought for use primarily for personal family or household purposes." ORS 72.8010(1).

[527]

the Uniform Commercial Code as enacted in this state. It creates implied warranties of merchantability and fitness for use from manufacturers to consumers. ORS 72.8020, 72.8030. It requires that manufacturers who make express warranties either maintain repair facilities in the state or be subject to having the retailer service or repair the nonconforming goods, with recourse against the manufacturer.

Under the statutory scheme the consumer looks to the retailer only if the manufacturer fails to maintain adequate service facilities in the state. ORS 72.8110. The record contains no evidence that Ford did not maintain adequate service facilities in the state: both defendants contend the dealer was such a facility. Therefore, the dealer is not liable to plaintiff under that statute.

The key section of the statute for our purposes is ORS 72.8100(4):

> "If the manufacturer is unable to service or repair the good in compliance with each applicable warranty, the manufacturer shall either replace the good or reimburse the buyer in an amount equal to the purchase price paid by the buyer less a reasonable charge for beneficial use by the buyer and damage, if any, to the good. In the event of replacement of the good or refunding of the purchase price, the buyer shall return the defective good to the warrantor free and clear of liens and encumbrances."

The record shows the Bronco to have been a consumer good and that Ford was unwilling or unable to resolve the rust problem. Ford argues, however, that it offered to replace the Bronco and that it has the option to choose whether to replace or refund plaintiff's money. Assuming, without deciding, that Ford has that option, the record shows that no offer to replace was ever made. The factory representative who dealt with plaintiff testified that he had no authority to offer plaintiff a replacement, but that he had suggested to Tom Beaty, president of defendant dealer, that he sell plaintiff a new Bronco (which plaintiff did not

want) or make an equitable trade. The factory representative testified that he could not participate beyond that. Mr. Beaty testified that he had no recollection of that suggestion. It is clear that Ford made no offer to replace the Bronco.

Ford contends, nevertheless, that plaintiff is not in a position to return the Bronco as required by the statute because the vehicle was repossessed by the dealer and sold. We conclude, however, that the dealer was Ford's agent at least for purposes of warranty work. The express warranty given by Ford instructed plaintiff to return the vehicle to the selling dealer for warranty service. It directed:

"The Dealership where you purchased your vehicle has the responsibility for performing warranty repairs; therefore, take your vehicle to that dealership. * * *"

Plaintiff informed the dealer in August, 1978, that he wanted his money back because of the defective condition of the Bronco which had not been remedied. The dealer asked plaintiff in September to bring the Bronco from the repair shop, where it had been sitting since June, to the dealer so that it could be inspected for damages. Plaintiff complied and the Bronco remained in the possession of the dealer until May, 1979, one month before the trial of this case, when it was resold.

Because the dealer was designated as Ford's agent for warranty work, we conclude that the return of the vehicle to the dealer was a return to Ford within the meaning of the statute. There was no other place to which plaintiff could have returned it, and Ford does not suggest one.

The statute requires not only that the good be returned to the manufacturer, but also that it be returned free of liens and encumbrances. Ford contends that plaintiff did not do that because the dealer held a security interest in the Bronco when it was returned to the dealer. Although that is factually

[529]

correct, there is no reason why that lien could not have been released or satisfied by Ford's returning the purchase price to the buyer through the dealer with instructions to make repayment to plaintiff when the dealer's security interest was paid in full.[9] The problem was purely a mechanical one in this case, and Ford made no effort to do that which it was required to do under the statute. The Bronco was sold because the security interest was not satisfied; the security interest was not satisfied because Ford failed to live up to its obligations. We conclude that Ford is obligated under the statute to reimburse plaintiff.

The amount of the reimbursement is more problematical. The statute provides for reimbursement of "an amount equal to the purchase price paid by the buyer less a reasonable charge for beneficial use by the buyer." ORS 72.8100(4). Because the trial court concluded that plaintiff was not entitled to recover from Ford as a matter of law, the amount to which plaintiff was entitled was not decided. It is sufficient to point out that the record is sufficient to support an award of money to plaintiff. It is undisputed that plaintiff paid $381 down, plus numerous monthly payments (which are not broken down as to interest and principal). The evidence of the value of "beneficial use" was, as the trial court commented, so imprecise that it was of no value. If Ford is to set off the beneficial use value of the vehicle to plaintiff, the burden is on it to show what that value is. We hold that plaintiff is not precluded as a matter of law from recovering from Ford. The posture of the case is the same as if the trial court had directed a verdict for Ford, when there was sufficient evidence to go to the

---

[9] There may be cases where the amount of reimbursement is less than the amount owing the secured party, in which case the purchaser would be required to provide additional funds to satisfy the security interest. The record does not show that was the case here.

[530]

jury.[10] The case must be remanded for a new trial as to the claim against that defendant.

Affirmed in part, reversed in part, and remanded.

---

[10] The trial court indicated at the close of all the evidence that he would receive memoranda from the parties on plaintiff's right to recover under the statutes relied upon. The court stated: "[W]hat I really have is a problem of law or laws. I do not have a problem of fact." Although the "decree" entered by the trial court recites that the court "finds in favor of each Defendant and against the Plaintiff on each count of Plaintiff's complaint," it is clear from the record that the court's "finding" was on matters of law.