610 So.2d 597 (1992)
FRANK GRIFFIN VOLKSWAGEN, INC., a Florida corporation, Appellant/Cross Appellee,
v.
Jerry T. SMITH, Appellee/Cross Appellant.
No. 90-979.
District Court of Appeal of Florida, First District.
December 11, 1992.
Rehearing Denied January 22, 1993.
*598 J. Michael Lindell of Hayes & Lindell, P.A., Jacksonville, for appellant.
William H. Folsom, Jr., of William H. Folsom, Jr., P.A., Jacksonville, for appellee.
ALLEN, Judge.
The appellant, Frank Griffin Volkswagen, Inc. (Griffin), and the appellee, Jerry T. Smith (Smith), were respectively the seller and buyer of a Volkswagen automobile. Following several unsuccessful efforts to correct mechanical problems with the automobile, Smith filed suit against Griffin and others. The parties challenge various rulings of the trial court during the course of the lawsuit. We affirm each of the rulings except the denial of Griffin's motion for a directed verdict on the count alleging Smith's right to revoke his acceptance under section 672.608, Florida Statutes (1987).
On September 2, 1987, Smith bought a new 1987 Volkswagen automobile from Griffin, an authorized Volkswagen dealer. At the time of purchase, Smith received and signed various documents indicating that Griffin was selling the automobile "as is" and that Griffin was disclaiming all warranties, express or implied, including the warranty of merchantability. The documents clearly indicated that the only warranties on the automobile were those of the manufacturer. Griffin's salesman gave Smith a warranty booklet identifying the warrantor as Volkswagen, and indicating that warranty service was available from any authorized Volkswagen dealer in the United States. The salesman also accurately told Smith that warranty service was available at any Volkswagen dealership. The relevant testimony from Smith was as follows:
Q. Now, concerning the ... warranty booklet ... [,] were you tendered that with respect to the purchase of this vehicle?
A. Yes, sir, I was.
Q. And who gave you that document?
A. The salesman, I believe.
Q. All right. Now, concerning the performance of the warranty, were there any conferences you had with the salesman concerning who would perform that warranty?
A. Yes, sir. They said any authorized Volkswagen dealer could perform warranty work on the car.
Q. And did they indicate to you what you should do if you had any problems with the vehicle within that warranty period?
A. Yes, sir. They said ... take it to any Volkswagen  authorized Volkswagen dealer and they would correct the problem.
Several weeks later, Smith began to experience mechanical problems with the automobile. He took it first to another Volkswagen *599 dealer and then to Griffin for repairs. Each time Smith took the automobile to Griffin, a Griffin employee would prepare a written repair order specifying the problem and the repair work completed. On each repair order, Griffin disclaimed all warranties, express or implied, on the products sold under the repair order and gave notice that any warranty on said products came from the manufacturer. Each repair order also contained the following statement: "We guarantee our service work for 6 mohths [sic] or 6000 miles, whichever comes first."
After numerous repair efforts proved unsuccessful, Smith filed suit against Griffin, Volkswagen, and others. The suit resulted in a jury verdict against Volkswagen for breach of Volkswagen's warranties, and against Griffin on various theories, including revocation of acceptance pursuant to section 672.608, Florida Statutes.
Griffin argues that the trial court erred in denying its motion for a directed verdict on the count alleging Smith's right to revoke his acceptance. Section 672.608(1) provides:
The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it:
(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
(b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
(Emphasis supplied). The first requirement for application of this section is that the goods be "nonconforming." Goods are conforming when they are in accordance with the obligations under the contract. § 672.106(2), Fla. Stat. Griffin's argument is that, because it disclaimed all warranties, it incurred no contractual obligations to Smith which could serve as a basis for his revocation of acceptance. Griffin relies upon cases such as McCormick Machinery, Inc. v. Julian E. Johnson & Sons, Inc., 523 So.2d 651, 656 (Fla. 1st DCA 1988); Konicki v. Salvaco, Inc., 16 Ohio App.3d 40, 474 N.E.2d 347 (1984); Crume v. Ford Motor Co., 60 Or. App. 224, 653 P.2d 564 (1982); and Clark v. Ford Motor Co., 46 Or. App. 521, 612 P.2d 316 (1980), for the proposition that an effective disclaimer of all warranties eliminates any claim that goods are nonconforming, and thereby precludes revocation of acceptance. See also, 1 J. White & R. Summers, Uniform Commercial Code, § 8-4, at 417 (3d ed. 1988). In response to this argument, Smith offers a series of arguments to support his entitlement to revoke his acceptance of the automobile.
First, Smith contends that when Griffin's salesman advised him that warranty service was available at any authorized Volkswagen dealership, Griffin thereby incurred a contractual obligation to successfully repair any defects covered under the Volkswagen warranty. We reject this argument. While oral representations will sometimes create contractual obligations, Seekings v. Jimmy GMC of Tucson, Inc., 130 Ariz. 596, 638 P.2d 210 (1981), the salesman's representations here provide no basis for obligating Griffin under the manufacturer's warranty. The salesman's statements can only be interpreted as an explanation of the manufacturer's warranty. Where a dealer has properly disclaimed all warranties, the delivering, presenting, or explaining of a manufacturer's warranty, without more, does not render the dealer a co-warrantor by adoption, Motor Homes of America, Inc. v. O'Donnell, 440 So.2d 422, 427 (Fla. 4th DCA 1983), rev. denied, 451 So.2d 849 (Fla. 1984), nor does it create a contractual obligation which can serve as a basis for a buyer's later revocation of acceptance. Should we hold otherwise, an automobile dealer would effectively be precluded from disclaiming responsibility for the warranties of the manufacturer, despite the fact that section 672.316, Florida Statutes, authorizes a dealer to do so.
We are also unpersuaded by Smith's contention that Griffin adopted Volkswagen's warranty as a result of certain language in the dealer agreement existing *600 between Volkswagen and Griffin. The agreement, admitted into evidence below, obligates Griffin to "make the text of the VW/US Warranties part of its contracts for sale of Authorized Products," and "comply with the provisions of the Volkswagen Dealer Warranty Manual," the warranty booklet given to Smith at the time of purchase which explained Volkswagen's limited warranty and promised that said warranty would be honored by any authorized Volkswagen dealer in the United States. We acknowledge that in Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960); Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 433 A.2d 801 (1981); Freeman v. Hubco Leasing, Inc., 253 Ga. 698, 324 S.E.2d 462 (1985); General Motors Acceptance Corp. v. Jankowitz, 216 N.J. Super. 313, 523 A.2d 695 (1987); and Felde v. Chrysler Credit Corp., 219 Ill. App.3d 530, 162 Ill.Dec. 565, 580 N.E.2d 191 (1991), appeal denied, 143 Ill.2d 637, 167 Ill.Dec. 398, 587 N.E.2d 1013 (1992), the courts determined that despite the dealers' attempts to disclaim all warranties, they had nevertheless adopted the automobile manufacturers' warranties and were liable thereunder to the disappointed buyers. In each of those cases, however, there was language in the dealer's sales contract with the buyer which reflected the dealer's intent to incorporate, by reference, the manufacturer's warranty.
In Henningsen, for example, the dealer disclaimed all warranties in the purchase contract, but in the same document "agree[d] to promptly perform and fulfill all terms and conditions of the owner service policy." The owner service policy, given to the buyer at the time of delivery of the automobile, repeated the manufacturer's warranty set out in the purchase contract and added a paragraph by which the dealer extended that warranty to the buyer in the same manner as if the word "Dealer" appeared in place of the word "Manufacturer." The court concluded that the dealer's intent was to incorporate the provisions of the owner service policy into the purchase contract. It went on to hold that because the disclaimer in the purchase contract was inconspicuous and the limited remedy afforded by the manufacturer was unconscionable, both the disclaimer and the manufacturer's limited remedy were void as against public policy. Henningsen, 161 A.2d at 96-97. Similarly, in Ventura, the dealer disclaimed all warranties in its sales contract but, at the same time, agreed "to promptly perform and fulfill all terms and conditions of the owner service policy." The court concluded that, even assuming that the dealer's disclaimer was conspicuous and not unconscionable, the dealer's reference in the sales contract to the manufacturer's warranty amounted to the dealer's "written warranty" under the Magnuson-Moss Warranty  Federal Trade Commission Improvement Act, sections 2301 to 2312, Title 15, United States Code Annotated (West 1982). Ventura, 433 A.2d at 809. Because the dealer had extended a written warranty within the meaning of that act, its attempted disclaimer of the implied warranty of merchantability was ineffective. 15 U.S.C.A. § 2308(a)(1). In Freeman, the dealer was found to have adopted the manufacturer's warranty because, at the time of purchase, the dealer made the buyer aware of its own agreement with the manufacturer to provide, free of charge, all service covered by that warranty. Freeman, 324 S.E.2d at 466-67. In Jankowitz, the dealer was found to have extended a written warranty to the buyer which nullified its attempted warranty disclaimer. The dealer's sale contract declared its intent to disclaim all warranties, but then indicated that the dealer might extend the buyer's written warranty within ninety days of the sale contract and, if it did, any implied warranty would last only as long as the written warranty. Because the only written warranty which had been given to the buyer was that of the manufacturer, the court concluded that the reference to that warranty in the sale contract amounted to the dealer's adoption of that warranty under the Magnuson-Moss Act. Jankowitz, 523 A.2d at 700-02. Finally, in Felde, the dealer was found to have adopted the manufacturer's warranty because its invoice given to the buyer at the time of purchase explained that the only warranty covering the automobile was that of the manufacturer, *601 "which warranty is incorporated herein and made a part hereof." Felde, 162 Ill. Dec. at 571, 580 N.E.2d at 197. See also, Rothe v. Maloney Cadillac, Inc., 142 Ill. App.3d 937, 97 Ill.Dec. 61, 67, 492 N.E.2d 497, 503 (1986) (explaining Ventura and Freeman), aff'd in part, rev'd in part on other grounds, 119 Ill.2d 288, 116 Ill.Dec. 207, 518 N.E.2d 1028 (1988).
By contrast, the retail buyer's order and installment contract signed by Smith contain no language from which we can infer that the dealer intended to incorporate by reference the provisions of Volkswagen's warranty. Although Griffin's dealer agreement with Volkswagen obligates Griffin to make Volkswagen's warranty "part of its contracts for sale" of Volkswagen products, there is no indication in the record that Smith was made aware of the provisions of the dealer agreement at the time of the sale, or indeed, at any time prior to suit. Even if Smith had been furnished a copy of Griffin's dealer agreement at the time of sale, we do not construe that agreement to require Griffin to adopt Volkswagen's warranties as its own. The dealer's promise to make Volkswagen's warranty part of its sale contract would seem to be satisfied by the dealer's transmission of the warranty booklet to the buyer upon delivery of the automobile, and its promise to comply with the provisions of Volkswagen's warranty would seem to be satisfied by its performance of warranty service work. In sum, we can find no indication that Griffin became Volkswagen's co-warrantor by adoption. See Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc., 558 A.2d 1066, 1073 (Del. Super. Ct. 1989) (the dealer's delivery of the manufacturer's warranty to the buyer, which warranty said that "any authorized Mercedes-Benz dealer" would make necessary warranty repairs was not an undertaking on the part of the dealer to repair the product); and Lytle v. Roto Lincoln Mercury & Subaru, Inc., 167 Ill. App.3d 508, 118 Ill.Dec. 133, 137, 521 N.E.2d 201, 205 (1988) (where the dealer "issued" the manufacturer's warranty to the buyer, but took no other steps that could be construed as an adoption of that warranty, it did not adopt the manufacturer's warranty within the meaning of the Magnuson-Moss Act); and cf. Simmons v. Taylor Childre Chevrolet-Pontiac, Inc., 629 F. Supp. 1030, 1032 (M.D.Ga. 1986) ("Nothing in the seller's invoice, the only writing [the dealer] itself extended to plaintiff, comes within the Magnuson-Moss definition of `written warranty.'").
Next, Smith argues that the salesman's statement that warranty service was available at any authorized Volkswagen dealer was a part of an unfair trade practice under Chapter 501, Florida Statutes, which was completed when Griffin subsequently failed to repair the automobile. Smith contends that Gardner v. Nimnicht Chevrolet Co., 532 So.2d 26 (Fla. 1st DCA 1988), stands for the broad proposition that a violation of Chapter 501 is a sufficient basis for revocation of acceptance. Because we do not believe the Gardner opinion sets forth sufficient facts for its holding to be so interpreted, and because, as we have previously said, the salesman's statements did not cause Griffin to incur any contractual obligation, we also reject this argument.
Smith further argues that Griffin's disclaimer of all warranties effectively created an exclusive remedy, Volkswagen's limited warranty. The argument continues that, when the remedy failed of its essential purpose due to Griffin's inability to repair the car, Smith became entitled to invoke all remedies provided in the Uniform Commercial Code. Section 672.719, Florida Statutes, authorizes the parties to a contract to provide for remedies in addition to, or in substitution for, those remedies provided in the UCC. Subsection 2 provides, "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code." Relying upon Parsons v. Motor Homes of America, Inc., 465 So.2d 1285 (Fla. 1st DCA 1985), and Tampa Farm Svc., Inc. v. Cargill, Inc., 356 So.2d 347 (Fla. 2d DCA 1978), Smith contends that he can pursue other UCC remedies, including revocation of acceptance, against Griffin. We reject this argument for two *602 reasons. First, Griffin disclaimed all warranties, express or implied, and the only remedy available to Smith was that of the manufacturer, not Griffin. "If the limited remedy provided by the manufacturer failed of its essential purpose, that does not render the goods nonconforming under [the consumer's] contract with the dealer, absent a warranty of merchantability." Crume, 653 P.2d at 567 (emphasis added); see also, 1 J. White & R. Summers, supra,at 599; and Agristor Credit Corp. v. Schmidlin, 601 F. Supp.1307, 1315-16 (D.Or. 1985) (no claim arising out of the alleged failure of the buyer's exclusive contractual remedy may be asserted against the seller where the limited remedy provided was made only by the manufacturer). Parsons and Cargill do not support the application of UCC remedies against a party who, like Griffin, has adequately disclaimed all warranties. Secondly, we agree with Griffin's contention that the jury in this case never found that the remedy provided by Volkswagen failed of its essential purpose, though that determination may well be one for the jury. See, Riley v. Ford Motor Co., 442 F.2d 670, 673 (5th Cir.1971); and Caterpillar Tractor Co. v. Waterson, 13 Ark. App. 77, 679 S.W.2d 814, 820 (1984).
Finally, Smith argues that Griffin's disclaimer of the implied warranty of merchantability is ineffective by virtue of section 2308 of the Magnuson-Moss Act. That section provides in relevant part:
(a) No supplier may disclaim or modify ... any implied warranty to a consumer with respect to such consumer product if ... at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.
... .
(c) A disclaimer, modification, or limitation made in violation of this section shall be ineffective for purposes of this chapter and State law.
15 U.S.C.A. § 2308(a)(2) & (c). According to Smith, Griffin entered into a service contract with him within ninety days of his purchase of the automobile. For this argument, he relies upon repair orders prepared by Griffin employees when he took his automobile to the dealer for warranty work. We note that only one of the repair orders, the one dated November 27, 1987, was prepared within ninety days of the date of sale. Because it appears that Griffin qualifies as a supplier under the act, see 15 U.S.C.A. § 2301(4), Smith is a "consumer," see 15 U.S.C.A. § 2301(3) and the automobile he purchased is a "consumer product," 15 U.S.C.A. § 2301(1), our inquiry focuses upon whether the referenced repair order constitutes a service contract. With respect to that repair order, Smith directs our attention to Griffin's statement, "We guarantee our service work for 6 [months] or 6000 miles, whichever comes first."
Section 2301(8) of the act defines a service contract as "a contract in writing to perform, over a fixed period of time or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product. 15 U.S.C.A. § 2301(8). The Federal Trade Commission, vested with rule-making authority under various provisions of the act, expounded upon the definition of service contract in section 700.11, Title 16, Code of Federal Regulations (1992).[1] That rule provides in relevant part:
A service contract under the Act must meet the definitions of [15 U.S.C.A. § 2301(8)]. An agreement which would meet the definition of written warranty in section [2301(6)(A) or (B)] but for its failure to satisfy the basis of the bargain test is a service contract. For example, an agreement which calls for some consideration in addition to the purchase price of the consumer product, or which is entered into at some date after the purchase of the consumer product to which it applies, is a service contract. An agreement which relates only to the performance of maintenance and/or inspection services and which is not an undertaking, promise, or affirmation *603 with respect to a specified level of performance, or that the product is free of defects in materials or workmanship, is a service contract. An agreement to perform periodic cleaning and inspection of a product over a specified period of time, even when offered at the time of sale and without charge to the consumer, is an example of such a service contract.
16 C.F.R. § 700.11(c). Notably, the Commission acknowledges in the first sentence of its rule that a service contract must meet the definition set out in section 2301(8) of the act. The examples given in the rule are, therefore, not to be taken as an indication that a contract which fails to meet all of section 2301(8)'s requirements will nevertheless qualify as a service contract under the act.
To be sure, Griffin's repair order is not an ordinary service contract like the extended warranty discussed in Parsons, 465 So.2d at 1293, the "extended service contract" referenced in Auburn Ford, Lincoln Mercury, Inc. v. Norred, 541 So.2d 1077, 1080 (Ala. 1989), or the service contract outlined in Patton v. McHone, 822 S.W.2d 608, 617 (Tenn. Ct. App. 1991). Though we are mindful of the Commission's sweeping examples and the deference which must be shown to its comments, we remain unable to conclude that Griffin's 6-month or 6000 mile guarantee of the service work identified on the repair order constitutes a contract to "perform, over a fixed period of time ... services relating to the maintenance or repair (or both) of [Smith's automobile]." In sum, we do not believe that the term "service contract" encompasses those situations where a supplier merely guarantees his repair work on an isolated post-sale repair job. See Robin Towing Corp. v. Honeywell, Inc., 859 F.2d 1218, 1223 (5th Cir.1988) (where all repairs to the consumer's fire alarm device were obtained separately by oral request and none of the consumer's contracts with the supplier indicated that any maintenance service would be forthcoming, the supplier had extended no service contract as defined in the act); and 16 C.F.R. § 700.1(h) which provides in part, "Warranties on replacement parts and components used to repair consumer products are covered; warranties on services are not covered. Therefore, warranties which apply solely to a repairer's workmanship in performing repairs are not subject to the Act."
In conclusion, we agree with Griffin's contention that Smith proved no breach of a contractual obligation which rendered the automobile nonconforming. Therefore, we determine that the trial court erred in denying Griffin's motion for a directed verdict on the revocation of acceptance count. Because Smith's claim for revocation of acceptance was not proved, he is not entitled to an award of consequential damages under section 672.715(2)(a), Florida Statutes.
Accordingly, those portions of the final judgment awarding damages against Griffin for Smith's revocation of acceptance, including the award of consequential damages, are reversed, and this cause is remanded for entry of a final judgment in accordance with this opinion. Because we find the parties' other assertions of error to be without merit, in all other respects, the trial court is affirmed.
WOLF, J., concurs.
ERVIN, J., concurs and dissents with opinion.
ERVIN, Judge, concurring and dissenting.
Although the majority's decision affirms all of appellant's issues except that relating to the award of damages on appellee's revocation of acceptance claim, which it has reversed, the effect of its reversal leaves appellee with no remedy whatsoever.[2] As a consequence, appellee retains an essentially *604 worthless vehicle, despite his obligation to pay the price of $13,393[3] for an automobile represented by the dealer to be a new 1987 Volkswagen Golf GT model. In so holding, the majority has accepted the dealer's argument that, because it disclaimed all warranties, express or implied, the dealer made no promises as to conformity, and, absent the nonconformity required under Section 672.608(1), Florida Statutes (1987) (Uniform Commercial Code (UCC) § 2-608(1)), revocation cannot be available as a remedy. As a result thereof, the dealer is permitted to induce a sale by offering the manufacturer's limited new vehicle warranty, while making oral representations agreeing that it would comply with the warranty, and thereafter on three separate occasions unsuccessfully undertook repairs under said warranty, each time offering written guarantees of its repairs for a specified durational period. Despite such conduct, the dealer is allowed to shield itself with disclaimers when the buyer's limited remedy fails, and the buyer is denied his remedy of revocation of acceptance. I cannot agree to such a result which I consider to be contrary to the UCC, the Magnuson-Moss Warranty Act, as well as the practicalities of modern automobile purchasing transactions, and therefore dissent to that portion of the majority's decision reversing the denial of the dealer's motion for directed verdict on the buyer's revocation of acceptance claim.
The majority's holding moreover ignores a fundamental tenet of the UCC, stating that "[t]he remedies provided by this code shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." § 671.106(1), Fla. Stat. (1987) (UCC § 1-106(1)). To better understand the positions urged by both appellant and by appellee, I consider it helpful to recite in greater detail the facts, the issues pled, the resolution of those issues below, and the points raised by the parties on appeal.
On September 2, 1987, Jerry Smith purchased a new 1987 Volkswagen automobile from Frank Griffin Volkswagen (Griffin), having a listed price of $13,393. The sales contract, signed by Smith and Griffin's salesman, contained a statement representing that the only applicable warranties were those offered by the manufacturer, and that the dealer explicitly disclaimed all warranties, express or implied. The same disclaimers were also made in a separate document entitled "`As Is' Dealer's Warranty,"[4] again executed by Smith and Griffin's representative.
At the time of the sale, Griffin delivered to Smith the manufacturer's booklet, containing its limited new vehicle warranty, stating that the warranty period was for two years without mileage limitation, covering all repairs to correct defects in materials or workmanship, except defects in tires. The booklet also stated that the warranty would be honored by all authorized Volkswagen dealers in the United States, and that they would repair defective parts or replace them free of charge. These written representations were confirmed by Griffin's salesman who orally advised Smith that if he had any problem with the vehicle within the warranty period, he should bring it to any authorized dealer and the problem would be corrected.
Less than three months after the sale, Smith noticed that when he attempted to start the car, it "struggled and hesitated." In Smith's words, it appeared to have a "cold start problem." On November 23, 1987, with approximately 3800 miles on its odometer, the automobile was towed to Tom Bush Volkswagen, another authorized Volkswagen dealer, for repairs. On the service order were the words that the engine "runs rough in lower gear, won't *605 run," and the jetronic control unit was replaced. Four days thereafter, on November 27, 1987, still experiencing problems with the vehicle starting, Smith took it to Griffin, where the repairs included, among other things, the replacement of an idle stabilizer valve. A statement was made on the service order that Griffin guaranteed its service work for six months or 6,000 miles, whichever first occurred. After the repairs were ostensibly completed, Smith drove the automobile from the dealership to Mayport, a distance of 25 miles, remained at his destination for approximately 30 minutes, and, when he attempted to start the engine again, the same problems recurred, that is, the engine struggled and hesitated. Nearly a month later, on December 21, 1987, Smith returned the vehicle to Griffin, complaining about the ever-recurring engine-starting problems. Once again the idle stabilizer valve was replaced. Again the service order represented that its service work was guaranteed for six months or 6,000 miles. Before Smith drove his automobile away, he asked a mechanic to accompany him on a test drive, and, as they were going through the gate of the dealership, the car again resumed its jumping, jerking, and hesitating actions; thereupon Smith returned it to the service desk where he received the mechanic's assurances that the vehicle would be properly repaired. Smith stated that another idle stabilizer valve was then placed in the vehicle.
Following the December 1987 attempt at repairs, the same problems shortly resurfaced in a practically identical manner. After driving the car from the dealership to a nearby naval air base, Smith parked it for approximately 30 to 45 minutes, attempted to restart it, and the engine once again began hesitating and struggling. The automobile's hesitation problems were no longer confined to the starting of the engine; the car also began jerking as if it were not getting enough fuel even after the engine was "warmed up." Frustrated, Smith returned the vehicle for the last time to Griffin on February 2, 1988 for repairs, complaining as well of other problems, specifically of water leaking into the rear of the automobile. On its repair order of February 2, 1988, Griffin represented that its service work was guaranteed for 3 months or 3,000 miles, whichever first occurred. Once again Griffin undertook repairs, and once again the repairs proved unavailing. Finally, on March 25, 1988, the vehicle was towed back to the Griffin dealership after it would not start, and Smith gave oral notice of revocation of acceptance to an employee of the dealer. Written notice of same was made by letter dated May 23, 1988 by Smith's attorney.
On June 2, 1988, Smith filed a multicount complaint against Griffin and the manufacturer, Volkswagen of America, Inc., and other persons not parties to this appeal, alleging in Count I, breach of implied warranty of merchantability; Count II, breach of express warranty; Count III, Florida Deceptive and Unfair Trade Practice Act violations (Sections 501.201-.213, Florida Statutes (1987)); Count IV, violation of the Magnuson-Moss Warranty Act (15 U.S.C.S. §§ 2301-2312 (Law. Co-op. 1982)); Count V, revocation of acceptance, pursuant to Section 672.608, Florida Statutes (1987) (UCC § 2.608); and Count VI, violation of Florida's Motor Vehicle Warranty Enforcement Act (the "Lemon Law," Sections 681.10-.111, Florida Statutes (1987)).[5] The trial court granted Griffin's motion to dismiss Counts II and IV, denied the motion as to Counts I, III, and V, but subsequently granted Griffin's renewed motion for summary judgment as to Count I of the complaint, and, after the court had denied Griffin's motions for directed verdict as to Counts III and V, the jury returned a verdict finding Griffin liable for $3,771.34 in damages on Count III and $24,807.76 in damages on Count V. As to the manufacturer, the jury returned a verdict finding it liable on Counts I, IV, and VI in the amount of $24,807.76. Subsequently, Smith, by prejudgment election of remedy, chose to proceed to judgment against the dealer only, and the trial court, in its final judgment, entered the following *606 amounts in favor of Smith: $24,807.76 in damages pursuant to the jury's verdict, $3,289.78 in prejudgment interest from the date of written notification of revocation of acceptance to the date of judgment, $14,208 in attorney's fees, and $634.40 in taxable costs, totaling $42,939.94.
Griffin raises the following points in its appeal from the judgment: (1) whether the trial court erred in admitting the testimony of a certain expert witness presented on behalf of Smith; (2) whether the trial court erred in denying Griffin's motion for directed verdict as to Count III of the complaint, alleging a Deceptive Trade Practice Act violation; (3) whether the trial court erred in denying Griffin's motion for directed verdict as to Count V of the complaint, seeking revocation of acceptance; (4) whether the trial court erred in refusing Griffin's jury instruction that any violation of Chapter 501, Florida Statutes, must have occurred at the time of the sale in order to support Smith's right to revoke acceptance; and (5) whether the trial court erred in ruling that Griffin was responsible for payment of any attorney's fees awarded in favor of Empire against Smith arising out of the retail installment contract.[6] Smith contends in his cross-appeal that the trial court erred in (1) granting Griffin's motion to dismiss Count III of the complaint, alleging breach of express warranty, (2) granting Griffin's motion to dismiss Count IV, alleging breach of obligations under the Magnuson-Moss Warranty Act, and (3) granting Griffin's motion for summary judgment as to Count I, alleging breach of implied warranty of merchantability.
I concur with the majority in affirming all issues raised by appellant except that pertaining to the revocation of acceptance claim. As to the latter issue, as previously stated, I dissent and my reasons therefor are stated in Part I, sections A and B of this dissent. If the majority had affirmed this issue, I would not reach any of the issues raised in appellee's cross-appeal. Because, however, the majority has reversed, I agree with appellee/cross-appellant's argument that the trial court erred in dismissing Count II of Smith's complaint as to Griffin, which alleged breach of an express warranty, and my reasons therefor are stated under Part I, section A. I also agree with appellee/cross-appellant's point that the trial court erred in dismissing appellee's claim pertaining to breach of the dealer's obligations under the Magnuson-Moss Warranty Act, and I have addressed this issue in Part II of this dissent. As to the third issue raised on cross-appeal, I agree with the majority that Griffin effectively disclaimed all implied warranties  not express warranties  under the UCC, and therefore concur with the majority in affirming as to it.

I. THE REVOCATION OF ACCEPTANCE CLAIM.
A. In determining whether the vehicle's nonconformity substantially impaired its value to Smith, the trial court could reasonably take into consideration the dealer's statements, both written and oral, agreeing to make repairs, as well as its course of performance following the sale, in order to decide whether the dealer's agreement to repair was part of the basis of the bargain between the parties at the time of the sale, or whether a new warranty obligation arose following the contract's execution, notwithstanding the existence of the dealer's disclaimers of all warranties, express or implied.
*607 In deciding that the oral statements of Griffin's salesman did not constitute a warranty, but simply an explanation of the manufacturer's warranty, the majority has confined its analysis almost exclusively to the written language contained in the sales contract and other documents executed at the time of sale that disclaimed all warranties. In so doing, the majority has apparently overlooked the code's definition of express warranties in Section 672.313(1)(a), Florida Statutes (1987) (UCC § 2-313(1)(a)), which provides: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." (Emphasis added.) Thus, the critical inquiry  unaddressed in the majority's opinion  is whether the dealer's oral statements made at the time of the sale,[7] together with its conduct thereafter, including its unsuccessful undertakings to make repairs, and its express written guarantees of repairs on its service orders for a specified durational period, show that the oral statements were part of the basis of the parties' bargain at the time the contract was made. In other words, was the dealer's agreement to comply with the manufacturer's warranty a negotiated item in the parties' contract? I think the record is clear that it was. The buyer was relying not simply upon the warranty of the manufacturer  a party with which he had no direct contact. He was instead relying on the dealer's representations that if any defect occurred in the automobile he purchased during the manufacturer's warranty period, the dealer  the party with which he had contracted in purchasing the automobile  would undertake to make prompt repairs.
Ordinarily, the issue of whether a warranty has been created is one of fact. Gladden v. Cadillac Motor Car Div., Gen. Motors Corp., 83 N.J. 320, 416 A.2d 394 (1980). Indeed, any attempt to show that a seller's affirmation is not part of the bargain must be supported by clear, affirmative proof. McGregor v. Dimou, 101 Misc.2d 756, 422 N.Y.S.2d 806 (Civ.Ct. 1979). Nor need any demonstration be made in regard to whether the buyer relied on an affirmation. The essential determination is simply whether the representation was part of the basis of the bargain. Ewers v. Eisenzopf, 88 Wis.2d 482, 276 N.W.2d 802 (1979).
Notwithstanding the above, I acknowledge that oral warranties are subject to the parol evidence rule. Section 672.202, Florida Statutes (1987) (UCC § 2-202), precludes the admission into evidence of any prior agreement or of a contemporaneous oral agreement to "a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein." (Emphasis added.) Thus, if an issue arises, as here, regarding whether an oral statement made by a seller at the time of the contract is inconsistent with a written warranty disclaimer, parol evidence may be admitted to determine if the contract was the final expression of the parties' agreement. See Husky Spray Serv., Inc. v. Patzer, 471 N.W.2d 146, 152 (S.D. 1991) ("[P]arol evidence may be admitted to determine whether the written contract is a final expression of the parties' agreement and whether the warranty, or disclaimer thereof, was part of the bargain explicitly negotiated between the parties.")
The code provides that any written agreement may be explained or supplemented:

*608 (1) By course of dealing or usage of trade (s. 671.205 [UCC § 1-205]) or by course of performance (s. 672.208 [UCC § 2-208]); and
(2) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.
§ 672.202(1) & (2), Fla. Stat. (1987) (UCC § 2-202(1) and (2)) (emphasis added). Course of performance means conduct subsequent to a contract's execution and is considered the best indication of what the parties intended the contract to mean. In re Dakota Country Store Foods, Inc., 107 B.R. 977 (Bankr.D.S.D. 1989). Section 672.208(1), Florida Statutes (1987) (UCC § 2-208(1)), relating to course of performance, provides that if "the contract... involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." (Emphasis added.) The UCC Official Code Comment to this section states: "The parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was." 19A Fla. Stat. Ann. 154 (1966) (emphasis added). Moreover, section 672.208(3) provides, subject to certain conditions not pertinent hereto, that "such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."
A case decided by the Colorado Court of Appeals, O'Neil v. International Harvester Co., 40 Colo. App. 369, 575 P.2d 862 (1978), well illustrates the interplay of the above statutory provisions. There the trial court had granted summary judgment against a buyer of a used diesel tractor and trailer in favor of the seller, based upon the following language contained in the retail installment contract:
Each USED motor vehicle covered by this contract is sold AS IS WITHOUT WARRANTY OF ANY CHARACTER expressed or implied, unless purchaser has received from seller a separate written warranty executed by seller.
Id. 575 P.2d at 864. Although the seller gave no written, express warranties to the buyer, the buyer stated in his deposition, submitted in opposition to the seller's motion for summary judgment, that he understood the above warranty-exclusion provision to mean that it would be consistent with the oral representation the defendant's salesman made to him, which, according to the buyer, was that the truck had been recently overhauled and would be suitable for his intended purpose, which was to haul firewood in the mountains.
In reversing the entry of summary judgment, and in remanding the case for trial on the buyer's claims for rescission of the contract and damages for breach of express and implied warranties, the Colorado Court of Appeals noted that the oral warranties the buyer relied upon were inconsistent with the warranty-exclusion clause, and therefore genuine issues of material fact remained unresolved:
Where, as here, the buyer alleges the existence of oral warranties prior to execution of the written contract, as well as conduct following the sale . .. which tends to show that warranties were in fact made, there is a material issue of fact for resolution. That issue is whether the parties intended the written contract to be a final expression of their agreement, and if not, what the terms actually agreed upon by the parties consisted of. Further, we hold that, under such circumstances, evidence of both oral warranties and the conduct of the parties subsequent to signing the contract is admissible for purpose of resolving this issue. Thus, entry of summary judgment on this issue was error.
Id. at 865 (emphasis added).
In the case at bar, the buyer submitted evidence showing the existence of oral statements prior to or contemporaneous with the execution of the written sales contract, as well as conduct following the sale consistent with such statements, e.g., unsuccessful repairs of the vehicle, together *609 with express, written guarantees by Griffin on each of the three service orders guaranteeing its service work for a specified period of time or driving distance. Under the circumstances, I consider that this evidence was properly admissible for the purpose of deciding whether the parties intended that their written contract disclaiming all warranties be the final expression of their agreements, and for the purpose of deciding whether the oral statement by the dealer to repair was a subsequently negotiated item in the parties' agreement which became part of the basis of the parties' bargain and was, consequently, an express warranty. This conclusion is supported by the following official comment to UCC § 2-202:
2. Paragraph (a) [(1)] makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.

19A Fla. Stat. Ann. 131 (1966) (emphasis added).
Even if the majority's interpretation of the salesman's oral statements, made at or about the time of the execution of the sales agreement, is correct, i.e., that they constituted only explanations of the manufacturer's warranty and were not express warranties themselves, such determination has no effect on whether the subsequent, written guarantees made by the dealer on each of the three repair orders, together with its conduct consistent therewith, were express warranties. Notwithstanding the parol evidence rule's bar of prior or contemporaneous expressions of a complete, unambiguous written contract, the rule does not, of course, bar the admission of a subsequent agreement that modifies a previous written agreement between the parties. The Race, Inc. v. Lake & River Recreational Properties, Inc., 573 So.2d 409, 410-11 (Fla. 1st DCA 1991); Linear Corp. v. Standard Hardware Co., 423 So.2d 966 (Fla. 1st DCA 1982).
For example, in Weiss v. Keystone Mack Sales, Inc., 310 Pa.Super. 425, 456 A.2d 1009 (1983), the Superior Court of Pennsylvania reversed the entry of summary judgment in favor of the seller in an action for damages brought by the buyer of a used truck. The trial court's summary judgment was based upon a warranty-exclusion clause prominently displayed on the face of the purchase order stating:
"THIS TRUCK SOLD `AS IS.' `WHERE IS.' NO WARRANTY OR GUARANTEE IS OFFERED OR IMPLIED."
Id. 456 A.2d at 1010. Immediately thereafter the following statement was made: "`Company specifically disclaims any implied warranty of merchantability or fitness for a particular purpose.'" Id. In the buyer's answer to the seller's interrogatories, however, he alleged that the salesman had orally advised him that the truck was the "`best-running truck that Keystone Mack had purchased from [its supplier] and ... that ... [it] was in excellent condition.'" Id. The buyer also placed in evidence a handwritten note on a repair order following the vehicle's purchase, stating: "`30 day warranty 50/50 on the 250 Cummings engine. If a problem develops, have the truck brought back to us. We certify that the engine is in excellent running condition.'" Id.
The Superior Court of Pennsylvania, as did the Colorado Court of Appeals in O'Neil, reversed the entry of summary judgment in favor of the seller, noting that the lower court did not consider whether the seller had effectively disclaimed express warranties under 13 Pennsylvania Consolidated Statutes Section 2316(a) (UCC § 2-316(1)), requiring that "`[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be *610 construed wherever reasonable as consistent with each other'" Weiss, 456 A.2d at 1012. In addressing the seller's conduct in attempting to make repairs following the truck's purchase, the Superior Court stated:
Also, the lower court confined its view of the case to the purchase order. The record suggests, however, that the events on which appellant's claim is based did not end with the signing of the purchase order. As we have discussed, when appellant complained that the engine was emitting smoke, appellee undertook to repair it, and gave appellant a "30 day warranty 50/50" on the engine, and "certif[ied]" that the engine was "in excellent running condition." Then, when it was discovered that the engine in fact had a cracked block, appellee replaced it, taking some sixty-seven days to do so. It is by no means clear  and the lower court did not consider  whether appellee's conduct subsequent to the execution of the purchase order resulted in a new contractual or warranty obligation coming into being, either as a proper modification of the purchase order, or as an obligation created later than and distinct from the purchase order.

Id. (emphasis added).
Thus, as the above cases indicate, a court may properly examine the parties' conduct subsequent to the execution of a written contract to determine whether such conduct clarifies what the parties intended, or to decide whether a new contractual warranty later came into existence, notwithstanding an earlier disclaimer of all warranties in the contract.
The majority, ante at 599, cites a number of opinions, including McCormick Machinery, Inc. v. Julian E. Johnson & Sons, Inc., 523 So.2d 651 (Fla. 1st DCA 1988), and Crume v. Ford Motor Co., 60 Or. App. 224, 653 P.2d 564 (1982), recognizing the rule that an effective disclaimer of all warranties eliminates any claim that goods are nonconforming, and thereby precludes revocation of acceptance. While this court in McCormick did so state, it distinguished the line of cases so holding (including Crume) from Seekings v. Jimmy GMC of Tucson, Inc., 130 Ariz. 596, 638 P.2d 210 (1981), stating that in the latter case, "[t]he seller's oral representations were part of the contract and as such were not negated by a written disclaimer." McCormick, 523 So.2d at 656 (emphasis added). As previously stated in this dissent, there was abundant evidence below from which the jury could properly decide that the seller's oral representations were part of the basis of the parties' bargain and therefore could not have been negated by the dealer's written disclaimers.
In Crume, unlike the present case, there were neither any oral statements nor subsequent written guarantees of repair, which, in my judgment, make the circumstances at bar clearly distinguishable. Indeed, the Court of Appeals of Oregon in Young v. Hessel Tractor & Equipment Co., 99 Or. App. 262, 782 P.2d 164 (1989), review denied, 309 Or. 522, 789 P.2d 1387 (1990), distinguished the facts before it from those existing in Crume, by noting that the dealer in Young had disclaimed all warranties, except a limited warranty against defects in the equipment for 12 months or 1500 hours. Despite the dealer's reliance upon Crume, the court noted that the dealer in Crume had disclaimed all warranties and that the vehicle conformed to the contract; thus, there was no possible nonconformity of the dealer's obligations which could serve as a basis for revoking acceptance. The court in Young observed, however, that "[n]othing in Crume suggests that a failure of essential purpose of a limited warranty provided by a dealer would not restore other remedies as provided by ORS 72.7190(2) [UCC § 2-719(2)]." Id. 782 P.2d at 168 (footnote omitted).
Therefore, in both Young and the present case, express, limited written warranties of repair were provided by the dealer: in Young, at the time of the execution of the contract; and here, on three separate occasions following the sale. Additionally, in both cases the evidence disclosed that the limited remedies provided failed of their essential purpose. Because of the failure of the specific remedy furnished *611 him, Smith had the right to pursue his remedy of revocation of acceptance. As stated in Section 672.719(2), Florida Statutes (1987) (UCC § 2-719(2)): "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code." Consistent with the code's provisions, Florida courts have recognized that in circumstances in which an exclusive, limited remedy fails, the "buyer's remedies were not limited to those in the contract, and that resort could be had to the remedies of the UCC." Tampa Farm Serv., Inc. v. Cargill, Inc., 356 So.2d 347, 350 (Fla. 2d DCA 1978). Accord Parsons v. Motor Homes of Am., Inc., 465 So.2d 1285, 1292 (Fla. 1st DCA 1985). As the Third District observed in Orange Motors of Coral Gables, Inc. v. Dade County Dairies, Inc., 258 So.2d 319 (Fla. 3d DCA), cert. denied, 263 So.2d 831 (Fla. 1972):
After the purchase of an automobile, the same should be put in good running condition; that is the seller does not have an unlimited time for the performance of the obligation to replace and repair parts. The buyer of an automobile is not bound to permit the seller to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty. At some point in time, if major problems continue to plague the automobile, it must become obvious to all people that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free of defect.
Id. at 320-21 (citations omitted).
B. Notwithstanding a clause generally disclaiming all warranties, such clause has no effect on a buyer's right to revoke acceptance, if the goods sold can otherwise be shown not to conform to the contract, and the buyer is able to meet the remaining requirements of section 672.608 (UCC § 2-608).
Even if the majority's draconian interpretation of the contract is correct, that the dealer's disclaimers effectively excluded the oral statements agreeing to repair, made before or contemporaneously with the execution of the written contract, as well as evidence of any consistent course of performance conducted by the dealer subsequent thereto, the majority's conclusion does not preclude a decision that the automobile was shown to be nonconforming to other portions of the written contract, thereby permitting the buyer to pursue his revocation of acceptance remedy. In so deciding, the majority has apparently overlooked that provision of the code recognizing that a dealer's statement on the face of a retail sales contract that an automobile sold as new[8] may itself be considered an express warranty and provide a means for seeking revocation of acceptance. Section 672.313(1)(b), Florida Statutes (1987) (UCC § 2-313(1)(b)), provides: "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." (Emphasis added.)
An excellent case exemplifying the application of the above provision is Blankenship v. Northtown Ford, Inc., 95 Ill. App.3d 303, 50 Ill.Dec. 850, 420 N.E.2d 167 (1981), wherein the buyer of a new automobile brought an action to rescind the sales contract and recover the purchase price, resulting from the dealer's failure to repair the automobile on 11 different occasions during a five-month period following the vehicle's purchase. Although the dealer's disclaimer of all warranties in the contract was deemed ineffective, because it was not drafted in compliance with the UCC, the court observed that even if the disclaimer were considered valid, the dealer could not avoid revocation of acceptance, because such remedy is not limited to goods which are unmerchantable, but that revocation "may be sought if the non-conformity of the goods substantially impairs their value to the buyer." Id. 50 Ill.Dec. at 853, 420 N.E.2d at 170. Relying upon the warranty of merchantability, the court noted that the automobile purchased by the buyer did not conform to the contract's description of *612 "new car." Id. at 854, 420 N.E.2d at 171. The court continued that such nonconformity, notwithstanding the general disclaimer clause, authorized revocation of acceptance, observing:
The logical extension of the dealer's argument in this case is that delivery by the dealer of anything which it referred to as a "new car," even an automobile without an engine, would bar plaintiffs' action for rescission based upon an implied warranty of merchantability. We agree with that comment to the UCC which specifically rejects this interpretation of the disclaimer provision and which states:
"4. In view of the principle that the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell, the policy is adopted of those cases which refuse except in unusual circumstances to recognize a material deletion of the seller's obligation. Thus, a contract is normally a contract for a sale of something describable and described. A clause generally disclaiming `all warranties, express or implied' cannot reduce the seller's obligation with respect to such description and therefore cannot be given literal effect under Section 2-316.
This is not intended to mean that the parties, if they consciously desire, cannot make their own bargain as they wish. But in determining what they have agreed upon good faith is a factor and consideration should be given to the fact that the probability is small that a real price is intended to be exchanged for a pseudo-obligation." Ill.Annot.Stat., ch. 26, par. 2-313, Uniform Commercial Code Comment (4) at 219-20 (Smith-Hurd 1963).
Id. (emphasis added).
The Blankenship result appears to have been approved by Professors White and Summers, who state:
What are the reasonable expectations of a buyer who has paid money and signed a document that disclaims all warranties but promises to deliver a new "automobile"? We believe that the buyer can reasonably believe that the word "automobile" is an express warranty that the machine purchased will behave in a certain way, namely, that it will carry him around town for at least a few thousand miles.
1 James J. White & Robert S. Summers, Uniform Commercial Code § 9-4 at 448 (3d ed. 1988).
That a remedy will be furnished to a buyer whose reasonable expectations have been frustrated due to a substantial impairment in the value of the goods purchased is apparent from an examination of many precode decisions. For example, in Regula v. Gerber, 34 O.O. 206, 70 N.E.2d 662 (Ct. Com.Pl. 1946), the seller of a used car sold "as is" brought an action against the buyer for the balance of the purchase price. The buyer answered, alleging that the car was worthless, and that he was therefore entitled to rescind the contract. Although the court observed that property purchased "as is," without warranty, was not returnable except in cases involving fraud, imposition, or other similar circumstances, the court concluded that the sale of the car in a severely defective condition caused an imposition to be placed upon the buyer, and that rescission therefore was proper. In so ruling, the court found an implied warranty, notwithstanding the sale of the car "as is." In the court's view the buyer paid a substantial price and, as a result, had the right to assume that the car was in running condition "even though there could be no implied warranty as to the length of time it would remain in a running condition." Id. at 212, 70 N.E.2d at 666.
The court thus created an implied warranty  despite the existence of an "as is" warranty disclaimer, and the absence of any evidence showing that the seller had actual knowledge of the automobile's problems  on the theory that the buyer was the recipient of a worthless car for which he had paid a substantial sum of money. Accord Woods v. Secord, 122 N.H. 323, 444 A.2d 539 (1982), involving the buyer's right to revoke acceptance of a used car sold "as is," which became inoperative before it was driven home. In Woods, the seller did not *613 remedy the defect, and the buyer revoked acceptance, which the court permitted, holding that "`[t]he purchase of the vehicle in an `as is' condition based upon a representation that the car was in good condition and ran properly was fundamental to the consideration on which the sale was predicated.'" Id. 444 A.2d at 540.
In the case at bar, the appellee first had the vehicle towed by wrecker truck to Tom Bush Volkswagen on November 23, 1987, less than three months after he had purchased it, and after he had driven it a little more than 3800 miles. I think it obvious that Mr. Smith's reasonable expectations were frustrated following his payment of and future obligation to pay a substantial sum of money for an automobile that the dealer had represented to him as new. Clearly, he did not intend to pay a substantial price in exchange for a pseudo-obligation; or, as more graphically stated in Gardner v. Gray, 171 Eng.Rep. 46, 47 (1815): "[T]he purchaser cannot be supposed to buy goods to lay them on a dunghill." (Quoted in Manning G. Warren III & Michelle Rowe, The Effect of Warranty Disclaimers on Revocation of Acceptance Under the Uniform Commercial Code, 37 Ala.L.Rev. 307, 336 & n. 150 (1986) [hereinafter Warren & Rowe].)
The Arizona Supreme Court used an approach similar to that used in Blankenship in Seekings v. Jimmy GMC of Tucson, Inc., 130 Ariz. 596, 638 P.2d 210 (1981), wherein the buyers of a new motor home, following unsuccessful efforts by the dealer to cure defects pursuant to the manufacturer's limited warranty, were allowed to revoke acceptance despite the dealer's disclaimer of all warranties. There the court rejected the dealer's contention that because it gave no warranties, it could not have sold nonconforming goods. In the court's view, the nonconformity language provided in UCC § 2-608(1), permitting a buyer to "revoke his acceptance of a ... commercial unit whose non-conformity substantially impairs its value to him if he has accepted it," could not be limited to failures to conform to either express or implied warranties. Seekings, 638 P.2d at 216-17. The defective vehicle, according to the court, did not conform to the seller's representation that the buyer would receive a new motor home warranted by the manufacturer. Id. at 216-18.
The Arizona Supreme Court's interpretation of UCC § 2-608(1) is consistent with other related provisions of the code and comments thereto. For example, as explained in Comment 2 to UCC § 2-714, the concept of "`non-conformity' ... includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract." 19A Fla. Stat. Ann. 506 (1966) (emphasis added). In the case of such nonconformity, the buyer is permitted to recover for his loss "`in any manner which is reasonable.'" Id. Accord Black v. Don Schmid Motor, Inc., 232 Kan. 458, 657 P.2d 517, 524 (1983). Moreover, in defining the term "conforming to the contract," the code explains that "[g]oods or conduct including any part of a performance are `conforming' or conform to the contract when they are in accordance with the obligations under the contract." § 672.106(2), Fla. Stat. (1987) (UCC § 2-106). The code defines the term "contract" as "the total legal obligation which results from the parties' agreement as affected by this code and any other applicable rules of law." § 671.201(11), Fla. Stat. (1987) (UCC § 1-201(11)). As explained in A & M Produce Co. v. FMC Corp., 135 Cal. App.3d 473, 186 Cal. Rptr. 114, 127-28 (1982):
The fact that a warranty is not stated in the written memorandum does not mean it is not part of the contract. Section 1201, subdivision (11) of the Commercial Code itself defines "contract" broadly to include anything which affects the legal obligation of the parties. The parties' "total legal obligation" may be a composite of written terms, oral expression and responsibilities implied by law. All may be enforced by an "action on [the] contract."
(Footnote omitted.)
The above statement is consistent with the following comments: "These `obligations' include the total mix of terms, conditions and warranties which form the *614 bargain of the parties. Nowhere in the UCC is the term limited to express and implied warranties made by the seller." Warren & Rowe, supra, at 326 (footnote omitted). The authors, moreover, are of the view that an action for revocation of acceptance is not dependent upon whether a breach of warranty has occurred, stating:
[T]he UCC's use of "non-conformity" in its remedial provisions for both damages and revocation, in contrast to the breach of warranty requirement in the Uniform Sales Act, indicates that the remedy of revocation is not limited to actions for breach of warranty. Rather, it is available in any case in which the goods do not conform to the contract, and in which the buyer is able to meet the remaining requirements of section 2-608. This conclusion is underscored by the UCC's mandate to the courts that its remedies be liberally administered.
Id. at 327 (footnote omitted).
The above comments are supported by a number of decisions in which courts have recognized that the remedy of revocation of acceptance is independent and separate from that of breach of warranty. See, e.g., Ford Motor Credit Co. v. Harper, 671 F.2d 1117, 1122 (8th Cir.1982) ("They are ... separate remedies treated in entirely different sections of the Code and they offer separate forms of relief."); O'Neal Ford, Inc. v. Earley, 13 Ark. App. 189, 681 S.W.2d 414, 417 (1985) ("[A]ppellee's [buyer's] agreement to limit her warranty rights under the Code did not affect her right to revoke acceptance."); Lytle v. Roto Lincoln Mercury & Subaru, Inc., 167 Ill. App.3d 508, 118 Ill.Dec. 133, 139, 521 N.E.2d 201, 207 (1988) (even if a defendant has effectively disclaimed all implied warranties, a plaintiff may nonetheless have a cause of action on a revocation of acceptance claim, and summary judgment as to same was improper);[9]Blankenship v. Northtown Ford, Inc., 95 Ill. App.3d 303, 50 Ill.Dec. 850, 853, 420 N.E.2d 167, 170 (1981) ("[T]he evidence ... demonstrated that the substantially defective nature of the vehicle ... impaired its value to the plaintiffs and thus revocation of acceptance is appropriate even if the dealer has properly disclaimed all implied warranties."); Capitol Cadillac Olds, Inc. v. Roberts, 813 S.W.2d 287, 290 (Ky. 1991) (claims for revocation of acceptance and damages for breach of warranty are mutually exclusive remedies; therefore, while the buyer had no action against the dealer for breach of implied warranties due to the dealer's warranty disclaimer, the disclaimer had no effect on the buyer's right to revoke acceptance).
The total mix of the parties' legal obligations resulting from their agreement, as affected by the UCC, demonstrates that Griffin Volkswagen, in exchange for the purchase price Smith paid, agreed to deliver to Smith a new Volkswagen automobile and orally assured Smith, at the same time, that if any defect occurred in the automobile during the manufacturer's warranty period, it would attempt to remedy the defect and make repairs thereto in accordance with such warranty. It unsuccessfully undertook to make repairs on three separate occasions following the purchase of the automobile. As a result of the dealer's failure to repair, the automobile sold as new, together with the reasonable expectations of the buyer ensuing therefrom, did not conform to the total legal obligations (express or implied by law) derived from the parties' agreement. Obviously, a new car which is inoperative does not meet the buyer's expectations that he is purchasing a new car, in operating condition, free from any substantial defects which would affect its operation as an automobile described by the seller as new. Consequently, a car which does not reasonably conform to such expectations is not what the buyer bargained to obtain, that is, it does not conform to the description of the automobile in the contract which was part of the basis of the parties' bargain. Therefore, the vehicle's nonconformity substantially impaired its value to Smith following its acceptance by him and frustrated his reasonable assumption that the nonconformity *615 would be cured, which was not, as required by the code, "seasonably cured." Based upon the above, I consider that the lower court correctly determined that Smith was entitled to have his revocation of acceptance claim tried by a jury, and I would therefore affirm as to this issue.

II. THE MAGNUSONMOSS WARRANTY ACT CLAIM.
Although I would not reach the above point, which appellee raised in his cross-appeal, if the majority had affirmed the issue pertaining to the revocation of acceptance claim, in that I consider the damages which are available to the buyer under the Magnuson-Moss Act to be no less than those under the UCC,[10] the majority's reversal of such claim requires that I address as well this issue. I agree with Smith that the lower court erred in granting the motion to dismiss. I think it clear from the recitation of the particular provisions of the Act, as stated in the majority's opinion, that the repair order, executed by Griffin within 90 days from Smith's purchase of the automobile, was precisely that as defined in the Act: "[A] contract in writing to perform, over a fixed period of time or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product." 15 U.S.C.S. § 2301(8) (Law. Co-op. 1984) (emphasis added).
The facts in Robin Towing Corp. v. Honeywell, Inc., 859 F.2d 1218 (5th Cir.1988)  an opinion the majority relies on in reaching its decision that the repair order at bar does not constitute a service order as defined by the Act  are clearly distinguishable from those at bar. In Robin Towing Corp., all service relating to a home security, burglary, and fire alarm system installed by Honeywell, Inc., at Robin's residence was obtained separately by oral request, and not, as required by the act, in writing. Moreover, the three printed forms signed by Robin, which were the contracts for installation of the system and indicated the type of contract or the service to be furnished, each contained a blank entitled "maintenance," yet none of the three blanks was checked. Id. at 1223. Significantly, unlike the case at bar, Robin Towing fails to show that any written warranties were given at the time of the contract or that any written repair orders were executed by the seller and the buyer subsequent thereto. In contrast, the written statement Griffin made within 90 days of the sale guaranteeing its repairs for a fixed period of time, together with the services then performed, involving the replacement of a defective part (an idle stabilizer valve), which was necessary to repair a consumer product, must be considered a service contract under the Act.
The majority also refers to that portion of 16 Code of Federal Regulations (C.F.R.) section 700.1(h), which excludes from the Act's coverage warranties on services or on a repairer's workmanship in performing repairs, in support of its conclusion that Griffin's repair order of November 27, 1987 was not a service contract, as defined by the Act. In so concluding, the majority fails to understand that the terms "warranty" and "service contract" are separately defined. See 15 U.S.C.S. section 2301(6) (Law. Co-op. 1982), defining written warranty, and subsection (8) thereof, defining service contract. The majority, moreover, does not mention that the statement upon which it relies is contained in section 700.1 of the regulations, which applies generally to consumer products. As will be explained in more detail, infra, the Act only pertains to written warranties of consumer *616 products which are made at the time of sale. The Act does not apply to warranties involving exclusively the sale of services. Therefore, the statement in section 700.1(h), excluding from coverage warranties on services, was not intended to apply to a warranty on the repair of a consumer product, as involved here, which was given within 90 days after the sale of the product.
As explained in 16 C.F.R. section 700.11(a): "The Act recognizes two types of agreements which may provide similar coverage of consumer products, the written warranty, and the service contract." Section 700.11(b) explains that "[a] written warranty must be `part of the basis of the bargain.' This means that it must be conveyed at the time of sale of the consumer product and the consumer must not give any consideration beyond the purchase price of the consumer product in order to benefit from the agreement." On the other hand, "an agreement ... which is entered into at some date after the purchase of the consumer product to which it applies, is a service contract." 16 C.F.R. § 700.11(c). Consequently, if the "agreement ... relates only to the performance of maintenance and/or inspection services and ... [if it] is not an undertaking, promise, or affirmation with respect to a specified level of performance [which is the definition of written warranty, as provided in 15 U.S.C.S. § 2301(6)(a) (Law. Co-op. 1982), it] ... is a service contract." Id. (emphasis added).
Therefore, the statement made in 16 C.F.R. section 700.1(h) that warranties on services are not covered must be considered in pari materia with section 700.12, pertaining explicitly to written warranties and service contracts. As section 700.1(a) otherwise makes clear, the warranty applicable at the time of the sale must relate to the consumer product sold, otherwise it would not comply with the definition of written warranty pursuant to the Act (15 U.S.C.S. § 2301(6) (Law. Co-op. 1982)). But the statement made in section 700.1(h), excluding warranties on services from coverage, obviously was not intended to apply to subsequent warranties on services or repairs of a consumer product previously sold. If it were the intent of the Federal Trade Commission to exclude from coverage a written warranty to repair a consumer product made within 90 days after the date of the product's sale, the regulation's effect would be repugnant to the clearly expressed definition of service contract, as provided in 15 U.S.C.S. section 2301(8). It is obvious that this was not the Commission's intention.
To conclude, I would affirm the judgment entered in its entirety; however, if it is necessary to reach the issues raised in Smith's cross-appeal, I would reverse the trial court's order in dismissing Count II of the complaint, relating to breach of an express warranty, and in dismissing Count IV of the complaint, relating to the breach of obligations under the Magnuson-Moss Warranty Act, and would remand the cause for trial as to those two claims.
NOTES
[1] The Commission's views concerning the scope of the act are entitled to great weight. Boelens v. Redman Homes, Inc., 748 F.2d 1058, 1063 n. 6 (5th Cir.1984).
[2] Notwithstanding the majority's affirmance of appellant's issue contending that the lower court erred in not directing verdict on appellant's Deceptive Unfair Trade Practice claim, it is my understanding that the jury's verdict in favor of appellee on same was precluded by reason of appellee's prejudgment election to proceed solely against the dealer on the revocation of acceptance claim. Thus, by reversing the final judgment as it relates to the revocation of acceptance award, appellee recovers nothing, although he is entitled to an automobile which is virtually inoperable.
[3] Because the sales price was financed, appellant has a total financial obligation of $18,970.17, which included his down payment of $2,066.25.
[4] An "as is" disclaimer means that goods are sold "with all faults" and has the effect of excluding all implied warranties, but not express warranties created in the same transaction. See § 672.316(3)(a), Fla. Stat. (1987) (UCC § 2-316(3)(a)). See also City Dodge, Inc. v. Gardner, 208 S.E.2d 794, 796 (Ga. 1974); Society Nat'l Bank v. Pemberton, 63 Ohio Misc. 26, 409 N.E.2d 1073, 1076 (Ohio Mun.Ct. 1979).
[5] Count VI was brought solely against the "distributor," Volkswagen of America, Inc.
[6] Empire of America FSB, the financier, was joined in Counts I, II, IV, and V of Smith's complaint as a party defendant and subsequently filed a counterclaim against Smith, alleging his failure to make payments under the retail installment contract and security agreement executed by him in connection with his purchase of the vehicle. The trial court granted judgment on the pleadings in favor of Empire and also on Empire's counterclaim against Smith. Subsequent to the jury's return of the verdict, Smith filed a motion requesting that the trial court assess against Griffin any attorney's fees awarded against Smith and in favor of Empire as to Empire's counterclaim for breach of the retail installment contract. In the final judgment, the court granted the motion, stating that all attorney's fees and costs awarded to Empire would be thereafter assessed against Griffin.
[7] Although the oral statements made by the salesman to Smith did not include the word "warrant" or "guarantee" or words of similar import, this is not essential. See Section 672.313(2), Florida Statutes (1987) (UCC § 2-313(2)): "It is not necessary to the creation of an express warranty that the seller use formal words such as `warrant' or `guarantee' or that he have a specific intention to make a warranty... ." Compare the representations made by Griffin's salesman, stating that warranty service was available at any authorized Volkswagen dealer, including Griffin, with the dealer's written agreement in the sales contract in Ventura v. Ford Motor Corp., 433 A.2d 801, 807 (N.J. Super.Ct.App.Div. 1981), stating that "dealer ... agrees to promptly perform and fulfill all terms and conditions of the owner service policy." In Ventura, the court held that such statement was a limited, written warranty which had the effect of passing on the manufacturer's warranty from the dealer to the purchaser.
[8] Although there was no textual language to that effect in the sales contract at bar, the box marked "new" was checked on the contract.
[9] Lytle is a case which the majority at bar cites as support for the rule that the mere delivery of the manufacturer's warranty does not make the dealer a co-warrantor. See ante at 601.
[10] The Magnuson-Moss Act authorizes civil actions by consumers for damages. 15 U.S.C.S. § 2310(d) (Law. Co-op. 1982). Section 2311(b)(1) further provides: "Nothing in this title shall invalidate or restrict any right or remedy of any consumer under State law." Courts have generally interpreted these provisions as requiring resort to state warranty law to determine the measure of damages under the Act. MacKenzie v. Chrysler Corp., 607 F.2d 1162, 1166 (5th Cir.1979); Rose v. A & L Motor Sales, 699 F. Supp. 75, 76 (W.D.Pa. 1988). Florida law permits recovery of actual, incidental, and consequential damages for breach of warranty. §§ 672.714-.715, Fla. Stat. (1987) (UCC §§ 2-714 to -715). And section 672.719(2) (UCC § 2-719(2)) provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code."